772 S.E.2d 517

**Henton T. CLEMMONS, Jr., Employee, Appellant,**

v.

**LOWE'S HOME CENTERS, INC.—HARBISON, Employer,
and Sedgwick Claims Management Services, Inc.,
Carrier, Respondents.**

Appellate Case No. 2013–001668.

No. 5308.

Court of Appeals of South Carolina.

Heard Nov. 5, 2014.

Decided April 1, 2015.

Rehearing Denied June 19, 2015.

368

370

Preston F. McDaniel, of McDaniel Law Firm, of Columbia, for Appellant.

Weston Adams, III, Kelly Fitzharris Morrow, and Helen Faith Hiser, all of McAngus Goudelock & Courie, LLC, of Columbia and Mount Pleasant, respectively; and M. McMullen Taylor, of Mullen Taylor, LLC, of Columbia, for Respondents.

LOCKEMY, J.

In this appeal from the Appellate Panel of the South Carolina Workers' Compensation Commission, Henton Clemmons contends the Appellate Panel erred in (1) proceeding with a hearing to determine his permanent disability award over his objection, (2) not finding him permanently and totally disabled due to a compensable work-related back injury, (3) not making a separate award for myelopathy as a neurological injury, (4) not making a separate award for a low back injury, and (5) assigning great weight to the medical opinion of his authorized treating physician. We affirm.

**FACTS**

Clemmons works for Lowe's Home Centers as a cashier. On September 12, 2010, he entered a trailer at the store where he worked and slipped on wet straw, landing on his back, neck, and head. Clemmons was originally treated by Doctor's Care after he complained of low back pain radiating to his legs. Initial medical examinations diagnosed him with back strain, radiculopathy,[1] and right knee strain. After Clemmons's condition deteriorated, he was referred to Dr. Thomas Armsey of Midlands Orthopedics for further evaluation and treatment.

On November 1, 2010, Dr. Armsey's examination revealed acute ataxia.[2] In his report, Dr. Armsey recorded:

Clemmons and his mother report that he was a perfectly functional 38–year–old male until his work-related accident. Since that time his gait has been severely ataxic, he cannot

---

1. Radiculopathy is a "[d]isease of the spinal nerve roots." *Stedman's Medical Dictionary* 1187 (24th ed.1982).

2. Ataxia is defined as "an ability to coordinate the muscles in the execution of voluntary movement." *Stedman's, supra,* at 135.

dress because of poor balance, [and] has been bed ridden because of his inability to ambulate. He has had multiple falls because of his poor balance which is all reported as beginning September 12, 2010. He has had ventricular shunts [3] placed as a child....

I am concerned about a brainstem or cerebellar lesion, possibly complications from his intraventricular shunts with his recent trauma. I am certain that his ataxia is not coming from his lumbar spine and his right knee has no mechanical abnormalities on clinical exam and therefore his sensation of instability is likely neurologic at the knee as well. I would recommend an immediate neurology or neurosurgery referral. He is essentially wheelchair bound [ ] and will not return to work until cleared by a neurosurgeon/neurologist.

Dr. Armsey referred Clemmons to Dr. Randall Drye, a neurosurgeon. A neurologic examination revealed Clemmons had normal strength and reflexes, but an MRI showed spinal cord compression from disk herniation. Dr. Drye diagnosed Clemmons with "herniated nucleus pulposus [ (herniated disc) ] with cord compression and severe myelopathy,[4] C5 and C7."

On November 9, 2010, Clemmons underwent an anterior cervical discectomy and fusion of C5 and C7. After the surgery, Clemmons returned to the hospital complaining of poor sensation and control of his legs, and he was transferred to HealthSouth rehabilitation facility. By November 24, 2010, Clemmons had recovered 90% of normal sensation in his legs with only mild spasticity and reported no issues with pain. In a November 30, 2010 report, Dr. Drye stated:

When we met in the office initially and we garnered his history he clearly reported no prior history of significant neck or neurologic problems prior to a fall at work. This occurred, according to the patient, on 9/12/10 when he slipped on some straw in a trailer and impacted on his back

---

3. Clemmons suffers from hydrocephalus—"[a] condition marked by an excessive accumulation of fluid dilating the cerebral ventricles, thinning the brain, and causing a separation of cranial bones." *Stedman's, supra,* at 663.

4. Myelopathy is defined as a "[d]isturbance or disease of the spinal cord." *Stedman's, supra,* at 918.

and the back of his head. This mechanism of injury is completely consistent as the force and flexion of the head and neck can result in a tear in the vulnerable disc and subsequent herniation.... Clemmons'[s] condition was perhaps worsened by the fact that he has congenital stenosis of the spine but again by history, he reports no prior symptoms of radicular nature or spinal cord dysfunction. For that reason, I believe that within a reasonable degree of medical certainty, his disc herniations, spinal cord impingement and subsequent myelopathy as well as the intervening surgery were a direct result of his fall at work.

Following his inpatient rehabilitation, Clemmons continued with outpatient physical therapy. After completing physical therapy, Clemmons had "regained relatively normal function in the upper extremities with no major complaints of numbness, tingling or weakness"; however, mild residual spasticity affected his gait and balance.

On November 30, 2010, Clemmons filed a Form 50, alleging he sustained an injury to his "head, back[,] and legs" as a result of the work-related accident. Lowe's admitted Clemmons sustained a work-related injury to his low back and right knee and agreed to pay Clemmons temporary total disability benefits from the date of the accident until properly terminated. Lowe's, however, denied Clemmons suffered an injury to his head or left lower extremity and further denied the extent of Clemmons's injuries.

On February 2, 2011, the parties entered a consent order in which Lowe's agreed to accept the back, neck, and right knee as compensable injuries. Lowe's also agreed to pay Clemmons temporary total disability benefits from the date of the accident until properly terminated due to a finding of maximum medical improvement (MMI), a return to work, or agreement of the parties.

On June 7, 2011, Dr. Drye concluded Clemmons had reached MMI, assigning a 25% whole person impairment "based on [his] injury to the cervical spine including a subsequent fusion and mild myelopathic residual symptoms." Thereafter, Lowe's asked Clemmons to provide a settlement demand pertaining to permanent disability. On September 22, 2011, Clemmons signed a Form 17, indicating he had

returned to work with restrictions but at a salary not less than before the injury. He accepted a position with Lowe's as a cashier with accommodations allowing him to sit and request assistance as needed.

On January 4, 2012, Lowe's filed a Form 21 requesting a hearing to determine any compensation due for permanent total disability or permanent partial disability and requesting credit for overpayment of temporary benefits. In response to Clemmons's request for an additional medical evaluation, Lowe's withdrew its Form 21 request in order to provide for another evaluation from Clemmons's treating neurosurgeon, Dr. Drye.

On June 18, 2012, Dr. Drye examined Clemmons and re-viewed recently performed magnetic imaging studies of Clem-mons's lumbar spine and neck. Clemmons reported neck and back stiffness and pain experienced in the morning, which improved as he moved about. Dr. Drye characterized this pain as "axial," "myofascial," and suggestive of "arthritic-type symptoms." Dr. Drye noted Clemmons had gained considera-ble weight and advised him that losing weight would likely help reduce his back pain. Dr. Drye stated Clemmons "denies any radicular symptoms down the leg and continues to have some altered gait from his previous myelopathy as well as a long-standing, pre-injury inversion to his right foot and ankle." Dr. Drye concluded Clemmons had reached MMI and reaf-firmed his earlier impairment rating of 25% whole person to the back.

Thereafter, Lowe's requested Clemmons "provide ... a settlement demand at [his] earliest convenience." After it received no settlement demand, Lowe's filed another Form 21 request for overpayment of temporary benefits and to deter-mine any permanent disability it owed Clemmons.

On September 5, 2012, Clemmons saw Dr. Howard Mandell, a neurologist, for an independent medical evaluation. Dr. Mandell noted Clemmons's "symptoms are stable now, not improving and not worsening for the past several months at least." Dr. Mandell concluded Clemmons did not "require additional treatment concerning his injuries other than per-haps ongoing physical therapy for balance and gait." Dr. Mandell also concluded there was "no indication" that Clem-

mons required further surgery. Finally, Dr. Mandell observed that Clemmons "still has spasticity in his legs, hyperreflexia, difficulty with coordination, inability to run[,] and difficulty with balance. I would say he is probably 85% better but still has this 15% neurological injury left over."

On September 6, 2012, Clemmons saw Dr. Leonard Forrest of the Southeastern Spine Institute for another independent medical evaluation. Dr. Forrest noted Clemmons's hydrocephalus "[has] left him with some cognitive deficits, but overall otherwise he was doing physically well until [his work-related injury]." Dr. Forrest stated Clemmons had reached MMI and agreed with a twenty-five pound lifting restriction. Dr. Forrest assigned him a 30% permanent impairment rating for his neck and 10% for his "low-back related symptoms and problems[,]" resulting in a permanent impairment rating of "at least 40%." Dr. Forrest concluded Clemmons's loss of function to his back "would be over 50%."

On September 11, 2012, Clemmons saw physical therapist, Tracy Hill, for a functional capacity evaluation. According to Hill, Clemmons qualified for a whole person impairment rating of 28%, "which convert[ed] to a 80% cervical spine impairment." She found that he also qualified for a whole person impairment rating of 8%, "which convert[ed] to a 11% lumbar spine impairment."

Also on September 11, 2012, Clemmons received another independent medical evaluation by Dr. Gal Margalit of Sunset Family Practice. Dr. Margalit concurred with Dr. Drye's opinions concerning continuing work restrictions and weight loss. Dr. Margalit, however, disagreed with Dr. Drye's impairment rating, stating Clemmons "lost more than 50% of the functional capacity of his back."

On September 13, 2012, Clemmons received a vocational assessment by Harriet Fowler. Fowler noted Clemmons was currently working at Lowe's in a light duty job in a satisfactory manner and had experienced no wage loss as a result of his injury. She stated that due to his condition, Clemmons was restricted from the medium, heavy, and very heavy categories of work and "technically from the light category-although obviously he is performing a light duty job, apparently satisfactorily." Fowler concluded Clemmons had experienced a

99.94% loss of access to the job market; however, she further stated his loss of access to the job market would be 76%, assuming he could perform light duty work. She advised that light duty labor may not be sustainable for Clemmons over a long period, and therefore, working at a sedentary level may provide a better chance for sustainable employment.

On September 25, 2012, the single commissioner held a hearing to determine the issues raised in the Form 21 filed by Lowe's. Clemmons argued the hearing on the Form 21 request for a determination of permanent disability benefits violated due process because he had a right to request compensation at a time of his choosing. Clemmons further asserted that he had not reached MMI and was entitled to a second opinion regarding his back and neurological dysfunction. Alternatively, he argued that if the single commissioner found he had reached MMI, then he was entitled to permanent total disability due to either (1) a 50% or more loss of use of the back under subsection 42–9–30(21) of the South Carolina Code (2015) or (2) loss of earning capacity under section 42–9–10 of the South Carolina Code (2015). Lowe's asserted Clemmons had reached MMI, that a second opinion was unnecessary in light of the additional evaluation by his treating physician, and that Clemmons was not entitled to permanent total disability under subsection 42–9–30(21) or section 42–9–10.

The single commissioner found Clemmons sustained a 48% permanent partial disability to his back under section 42–9–30, which included "any radicular symptoms to his right leg." The single commissioner also found Clemmons was not entitled to permanent total disability pursuant to section 42–9–10 because he had returned to work for almost two years. Clemmons appealed to the Appellate Panel, which affirmed the single commissioner's order in its entirety. This appeal followed.

**STANDARD OF REVIEW**

■■■■ "The Administrative Procedures Act (APA) provides the standard for judicial review of decisions by the [Appellate Panel]." *Pierre v. Seaside Farms, Inc.*, 386 S.C. 534, 540, 689 S.E.2d 615, 618 (2010). "[An appellate] court can reverse or modify the [Appellate Panel]'s decision if it is affected by an error of law or is clearly erroneous in view of the reliable,

probative, and substantial evidence in the whole record." *Id.* "Substantial evidence is not a mere scintilla of evidence, but evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the agency reached." *Id.* (internal quotation marks omitted). The possibility of drawing two different conclusions from the evidence does not prevent a finding from being supported by substantial evidence. *Hall v. Desert Aire, Inc.,* 376 S.C. 338, 348, 656 S.E.2d 753, 758 (Ct.App.2007).

■■■■ "Where there are conflicts in the evidence over a factual issue, the findings of the [Appellate Panel] are conclusive." *Hall v. United Rentals, Inc.,* 371 S.C. 69, 80, 636 S.E.2d 876, 882 (Ct.App.2006). "The [Appellate Panel] is the ultimate fact finder in [w]orkers' [c]ompensation cases...." *Hargrove v. Titan Textile Co.,* 360 S.C. 276, 289, 599 S.E.2d 604, 611 (Ct.App.2004). The final determination of witness credibility and the weight of the evidence is for the Appellate Panel. *Id.* "Where the medical evidence conflicts, the findings of fact of the [Appellate Panel] are conclusive." *Mullinax v. Winn–Dixie Stores, Inc.,* 318 S.C. 431, 435, 458 S.E.2d 76, 78 (Ct.App.1995).

## LAW/ANALYSIS

### I. Form 21 Request for Hearing

### A. Due Process

■■■ Clemmons argues the Appellate Panel violated his substantive and procedural due process rights to request a hearing for a determination of his permanent disability award at a time of his choosing. According to Clemmons, only he "has the right to bring a cause of action for a determination of [permanent disability] benefits and it is a denial of due process to force [him] to a premature determination of those benefits where he has not made a request that he be awarded any benefits whatsoever under the [Workers' Compensation] Act (the Act)." We disagree.

■■■ To establish a procedural due process claim, a person must show deprivation of his liberty or property interests due to the government's failure to provide notice, an opportunity to be heard in a meaningful way, or judicial review. *Harbit v.*

*City of Charleston*, 382 S.C. 383, 393, 675 S.E.2d 776, 781 (Ct.App.2009). This court previously has identified "adequate notice," "adequate opportunity for a hearing," "the right to introduce evidence," and "the right to confront and cross-examine witnesses" as the minimal due process requirements in a contested case proceeding such as a workers' compensation hearing. *Adams v. H.R. Allen, Inc.*, 397 S.C. 652, 657, 726 S.E.2d 9, 12 (Ct.App.2012).

Clemmons has failed to show a procedural due process violation. The Commission held hearings to determine Clemmons's permanent disability benefits after notice was provided to both parties. At the hearings, Clemmons had the right to call any witness, cross-examine all adverse witnesses, and was allowed to present any admissible evidence to support his claim. Clemmons's primary complaint with the Commission proceeding with a hearing at this time appears to be that he was entitled to a "second opinion" regarding the extent of his impairment; however, after Dr. Drye assigned Clemmons an impairment rating of 25% whole person to the back, Clemmons received evaluations from Dr. Forrest, Dr. Mandell, Dr. Margalit, Hill, and Fowler, which the Commission considered in deciding his permanent disability benefits. Accordingly, the procedure employed by the Commission comported with due process.

## B. Authority to Hear Claim

 Clemmons next argues the Commission lacked statutory authority and jurisdiction to hold a hearing to determine his permanent disability benefits because he did not request a hearing to determine those benefits. He asserts that under subsection 42–9–260(E) of the South Carolina Code (2015), "An employer may request a hearing at any time to address termination or reduction of *temporary* disability payments"; however, the Act does not allow an employer to request a hearing to pay permanent disability benefits. (emphasis added). We disagree.

Section 42–17–20 of the South Carolina Code (2015) provides:

If the employer and the injured employee or his dependents fail to reach an agreement in regard to compensation under

this title within fourteen days after the employer has knowledge of the injury ... either party may make application to the [C]ommission for a hearing in regard to the matters at issue and for a ruling thereon.

In *McMillan v. Midlands Human Resources*, this court held an employer has a statutory right under section 42–17–20 to request a hearing when it has knowledge of an injury for more than fourteen days, and the parties fail to reach an agreement for compensation. 305 S.C. 532, 534, 409 S.E.2d 443, 444 (Ct.App.1991).

The Commission did not err in proceeding with a hearing to determine Clemmons's permanent disability award. Clemmons's injury occurred on September 12, 2010. On September 16, 2011, and July 24, 2012, Lowe's asked Clemmons for a settlement agreement for permanent disability compensation and received no settlement offer. Because fourteen days had passed since Clemmons's injury and the parties failed to reach an agreement as to an award for permanent disability, Lowe's had the right to request a hearing to determine compensation for any permanent disability, and the Commission was authorized to act on the request for a hearing under section 42–17–20.

Clemmons relies on *South Carolina Property & Casualty Insurance Guaranty Association v. Carolinas Roofing & Sheet Metal Contractor's Self–Insurers Fund*, 303 S.C. 368, 401 S.E.2d 144 (1991) as support for his argument that the Commission lacks jurisdiction to determine an employee's permanent disability benefits when the employee does not request the hearing to determine permanent disability benefits. We disagree.

In *Carolinas Roofing*, the employee entered into a settlement agreement with his employer and its workers' compensation carrier that fully satisfied all liability under the Act. *Id.* at 370, 401 S.E.2d at 145. The employer's carrier became insolvent, making the South Carolina Property & Casualty Insurance Guaranty Association (Guaranty Association) responsible for providing coverage. *Id.* The Guaranty Association declined to pay the claim and filed a declaratory judgment in the circuit court seeking to determine its liability for the claim. *Id.* The respondents moved to dismiss the action, alleging the

Commission had exclusive jurisdiction over the action. *Id.* The circuit court held the Commission had exclusive jurisdiction and entered a judgment in favor of the respondents. *Id.* On appeal, the issue before our supreme court was "whether there was a pending employee claim for compensation before the Commission at the time the action was commenced in circuit court." *Id.* at 371, 401 S.E.2d at 145. The supreme court held the settlement agreement terminated the employee's pending claim before the Commission; therefore, the Commission lacked jurisdiction to decide the issue raised by the Guaranty Association. *Id.* at 371–372, 401 S.E.2d at 146.

Unlike *Carolinas Roofing,* a "pending employee claim for compensation" existed here because Clemmons's claim for workers' compensation benefits had not been decided when Lowe's requested a hearing to determine the permanent disability award. Moreover, Clemmons and Lowe's never entered a settlement agreement to resolve any liability that existed under the Act. Therefore, the Commission had jurisdiction to hold a hearing upon Lowe's request to determine whether Clemmons was entitled to permanent disability benefits.

## II. Permanent Total Disability

### A. 50% or more loss of use of back

Clemmons next argues the Appellate Panel erred in not finding him permanently and totally disabled due to 50% or more loss of use of the back. He contends he met his burden of proving he sustained 50% or more loss of use to his back, and Lowe's failed to rebut the presumption, thereby making him entitled to permanent total disability under section 42–9–30. We disagree.

"[I]n cases where there is fifty percent or more loss of use of the back the injured employee shall be presumed to have suffered total and permanent disability and compensated under [s]ection 42–9–10(B)." S.C.Code Ann. § 42–9–30(21) (2015). This presumption is rebuttable. *Id.*

"To qualify for total and permanent disability, a claimant must suffer a 50% or greater loss of use of his back." *Clark v. Aiken Cnty. Gov't,* 366 S.C. 102, 115, 620 S.E.2d 99,

105 (Ct.App.2005). "The [Appellate Panel]'s finding as to the degree of impairment is a question of fact." *Id.* "[T]he determination of an injured employee's impairment rating is more art than science, involving the consideration of evidence the [Appellate Panel] may gather from the injured employee, medical and vocational experts, and lay witnesses[.]" *Burnette v. City of Greenville,* 401 S.C. 417, 429, 737 S.E.2d 200, 206–07 (Ct.App.2012). "While an impairment rating may not rest on surmise, speculation or conjecture . . . it is not necessary that the percentage of disability or loss of use be shown with mathematical exactness." *Fishburne v. ATI Sys. Int'l,* 384 S.C. 76, 86, 681 S.E.2d 595, 600 (Ct.App.2009) (alteration in original) (internal quotation marks omitted). "The Appellate Panel is not bound by the opinion of medical experts and may find a degree of disability different from that suggested by expert testimony." *Id.* (internal quotation marks omitted).

Substantial evidence supports the Appellate Panel's finding that Clemmons was not entitled to permanent total disability under section 42–9–30 due to 50% or more loss of use of his back. After considering "the medical evidence as a whole," the Appellate Panel determined Clemmons sustained a 48% permanent partial disability to the back. In making this finding, the Appellate Panel relied on the medical reports of Dr. Drye who assigned Clemmons a 25% whole person impairment rating "based on his injury to the cervical spine including a subsequent fusion and mild myelopathic residue symptoms." Dr. Drye noted Clemmons's stiffness and pain in his back was "strongly suggestive of arthritic-type symptoms," and advised Clemmons that continued stretching exercises as well as weight loss would help with his lumbar symptoms. Admittedly, Clemmons presented medical evidence that supported an award of 50% or more loss of use to the back. Specifically, Dr. Forrest opined that Clemmons's loss of function to his back "would be over 50%." Likewise, Dr. Margalit stated Clemmons "lost more than 50% of the functional capacity of his back." Nevertheless, after considering all the medical evidence, the Appellate Panel chose to place more weight on Dr. Drye's reports, which was in its discretion as the factfinder. Although the Appellate Panel could have reasonably concluded Clemmons's loss of use to the back was 50% or more, "where the medical evidence conflicts, the findings of

fact of the [Appellate Panel] are conclusive." *Mullinax*, 318 S.C. at 435, 458 S.E.2d at 78; *see also Harbin v. Owens–Corning Fiberglas*, 316 S.C. 423, 427, 450 S.E.2d 112, 114 (Ct.App.1994) ("The existence of any conflicting opinions between the doctors is a matter left to the [Appellate Panel]."). Because substantial evidence supports the Appellate Panel's finding that Clemmons suffered a 48% permanent partial disability to the back, we affirm as to this issue.[5]

## B. Wage Loss

 Clemmons next argues the Appellate Panel erred in considering wage loss in deciding whether he suffered 50% or more loss of use of his back. We disagree.

 "While [permanent total disability] is generally based on loss of earning capacity, [sub]section 42–9–30(21) states there is a rebuttable presumption of [permanent total disability] when a claimant has 50% or more loss of use of the back." *Watson v. Xtra Mile Driver Training, Inc.*, 399 S.C. 455, 464, 732 S.E.2d 190, 195 (Ct.App.2012). "Therefore, a claimant with 50% or more loss of use of the back is not required to prove loss of earning capacity to establish [permanent total disability]." *Id.*

 The Appellate Panel addressed whether Clemmons was entitled to permanent total disability under sections 42–9–30 and 42–9–10. It first found Clemmons was not entitled to permanent total disability under subsection 42–9–30(21) because his loss of use of the back was 48%. *Cf.* S.C.Code Ann. § 42–9–30(21) (stating a claimant with 50% or more loss of use of the back is presumed to be permanently and totally disabled). The Appellate Panel then found Clem-

---

5. At oral argument, Clemmons contended the Appellate Panel erred in its award because all the medical evidence established his loss of use of the back was over 50%. Specifically, Clemmons pointed out subsection 42–9–30(21) addresses "loss of use" of the back, not "impairment" or "disability" and Dr. Drye's records do not support the Appellate Panel's finding of 48% permanent partial disability because they only addressed Clemmons's *impairment* rating. We disagree. Although Dr. Drye's records do not use the language "loss of use" of the back, we believe his 25% impairment rating provides substantial evidence to support the Appellate Panel's determination that Clemmons's loss of use of the back was not 50% or more.

mons was not entitled to permanent total disability under section 42–9–10 because he had returned to work for almost two years. Contrary to Clemmons's argument, the Appellate Panel considered loss of earning capacity when it addressed permanent total disability under section 42–9–10, not section 42–9–30. We find no error in the Appellate Panel's analysis because loss of earning capacity is generally a prerequisite to a finding of permanent total disability under section 42–9–10. *See Skinner v. Westinghouse Elec. Corp.,* 394 S.C. 428, 433, 716 S.E.2d 443, 445–46 (2011) ("It is well-settled that an award under [section 42–9–10] must be predicated upon a showing of a loss of earning capacity. . . ." (internal quotation marks omitted)). Because Clemmons returned to work in a job similar to that which he had prior to the accident making the same salary, the Appellate Panel did not err in finding he was not entitled to permanent total disability under section 42–9–10. *See Watson,* 399 S.C. at 462–63, 732 S.E.2d at 194–95 (noting an employee was not entitled to permanent total disability under section 42–9–10 when there was evidence she "could return to work in an occupation that complied with her job factor restrictions"). Finally, Clemmons argues that even if loss of earning capacity is a proper consideration in deciding permanent total disability under section 42–9–30, substantial evidence indicates he is permanently and totally disabled because his vocational evaluation determined he was excluded from more than 99% of the job market in the United States. Clemmons's argument erroneously attempts to infuse loss of earning capacity into the analysis of permanent total disability under section 42–9–30. Although Clemmons's exclusion from the job market would be an appropriate consideration when deciding permanent total disability under section 42–9–10, it is irrelevant under section 42–9–30. *See Watson,* 399 S.C. at 464, 732 S.E.2d at 195. Accordingly, we affirm the Appellate Panel as to this issue.

### III. Myelopathy

■■■ Clemmons next argues the Appellate Panel erred in not making an award for myelopathy as a separate neurological injury. We disagree.

The Appellate Panel found "[Clemmons]'s permanent partial disability includes any radicular symptoms to his right leg."

This finding was based on Dr. Drye's conclusion that Clemmons suffered a 25% whole person impairment "based on [his] injury to the cervical spine including a subsequent fusion and mild myelopathic residual symptoms." Thus, the Appellate Panel included residual myelopathy in its permanent partial disability award to the back, and it consequently rejected Clemmons's claim for a neurological award for myelopathy. We believe substantial evidence supports this finding. Although Dr. Mandell observed that Clemmons "is probably 85% better but still has this 15% neurological injury left over," we do not believe he was assigning an impairment rating for myelopathy as a neurological injury; rather, he was explaining Clemmons had not recovered 100% of his pre-injury functioning. Furthermore, Dr. Drye noted Clemmons continued to have altered gait from his previous myelopathy; however, Dr. Drye did not offer a separate impairment rating for myelopathy and opined that Clemmons's current symptoms were consistent with "axial and myofascial pain and strongly suggestive of arthritic type symptoms." Accordingly, the Appellate Panel did not err in deciding not to make an award for myelopathy as a separate neurological injury.

## IV. Low Back Injury

■ Clemmons next argues the Appellate Panel erred in not making a separate award for his low back injury. Specifically, he asserts that he presented substantial evidence showing he sustained an additional injury to his "low back" that was separate and distinct from the injury to his back. We disagree.

■ The Appellate Panel's finding that Clemmons sustained a 48% permanent partial disability to the back under subsection 42–9–30(21) included any impairment to the low back. *See Lyles v. Quantum Chem. Co. (Emery)*, 315 S.C. 440, 443, 446, 434 S.E.2d 292, 294–95 (Ct.App.1993) (analyzing an injury to "the low back" under subsection 42–9–30(21)). Subsection 42–9–30(21) addresses "the loss of use of the back"; however, the term "back" is not defined in the Act. "In construing a statute, courts should give words their plain and ordinary meaning and should not resort to subtle or forced construction to limit or expand the statute's operation." *Hartford Acc. & Indem. v. S.C. Second Injury Fund*, 316 S.C. 420,

422, 450 S.E.2d 110, 111 (Ct.App.1994) (defining the term "conceal" according to its "plain and ordinary meaning" when it was not defined in the Act). Merriam Webster's Collegiate Dictionary defines the "back" as "the rear part of the human body esp. from the neck to the end of the spine." *Merriam Webster's Collegiate Dictionary*, 83 (10th ed.1993). Thus, the plain and ordinary meaning of the word "back" includes the low back. Moreover, section 42–9–30 does not recognize the "low back" as a separate scheduled member. Accordingly, this issue is without merit.

## V. Weight Assigned to Dr. Drye's Opinion

Clemmons next argues the Appellate Panel erred in assigning great weight to the medical opinion of Dr. Drye because it contradicted the other medical evidence. We disagree.

The Appellate Panel did not err in assigning great weight to Dr. Drye's medical opinion. *See Etheredge v. Monsanto Co.*, 349 S.C. 451, 455, 562 S.E.2d 679, 681 (Ct.App.2002) ("The final determination of witness credibility and the weight to be accorded evidence is reserved to the [Appellate Panel]."). Dr. Drye was Clemmons's authorized treating physician, and he treated Clemmons for over two years. After reviewing the medical evidence presented, the Appellate Panel determined Dr. Drye's medical reports "were the most persuasive." In a November 30, 2010 report, Dr. Drye stated Clemmons's "disc herniations, spinal cord impingement and subsequent myelopathy as well as the intervening surgery were a direct result of his fall at work." On June 18, 2012, Dr. Drye noted Clemmons "denies any radicular symptoms down the leg and continues to have some altered gait from his previous myelopathy as well as a long-standing, pre-injury inversion to his right foot and ankle." Although the June 18, 2012 report implies that Clemmons's myelopathy existed prior to his work-related injury, which contradicts the November 30, 2010 report, it was the Appellate Panel's duty as the factfinder to resolve this contradiction. *See Mullinax*, 318 S.C. at 435, 458 S.E.2d at 78 ("Where the medical evidence conflicts, the findings of fact of the [Appellate Panel] are conclusive."). Therefore, we find no error because this issue concerned a question of the weight assigned to the evidence.

## CONCLUSION

Based on the foregoing, the Appellate Panel's decision is AFFIRMED.

FEW, C.J., and McDONALD, J., concur.